Gary Lee SCHWENK

v.

The STATE of Texas, Appellee.

No. 61084.

Court of Criminal Appeals of Texas,
Panel No. 2.

Oct. 28, 1981.

On Rehearing June 24, 1987.

Dewey F. Meadows, Robert F. Andrews and Roger N. Schmidt, Houston, for appellant.

Carol S. Vance, Former Dist. Atty., and Calvin A. Hartmann and Terry Wilson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, CLINTON and TEAGUE, JJ.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for the offense of criminal solicitation[1] in which the jury assessed punishment is seven years confinement.

The sufficiency of the evidence is challenged.

Viewed in a light most favorable to the jury's verdict of guilt, the evidence reflected that undercover police officers David Galindo and David Sheetz received information on or about July 5, 1976 from an unidentified informant which resulted in Galindo's receipt of a telephone call from appellant on or about July 12, 1976. In this conversation, appellant advised Galindo he "wanted somebody to disappear." In a second conversation appellant indicated the intended victim was his wife and informed Galindo of her work and home addresses. A contract price of $8,000 was discussed. In a third conversation, appellant advised Galindo he would only pay $2,000. Galindo suggested that they meet and discuss the matter face to face.[2] Appellant agreed to bring $1,500 to the meeting so Galindo could count it. On July 26, 1976, appellant and Galindo met behind a lounge.[3] According to Galindo's testimony:

"I told [appellant] that I had a cousin that was going to help me on this thing.

\* \* \* \* \* \*

Q: What did you tell the Defendant, Gary Schwenk, that your cousin was to do in regards to doing away with his wife?

\* \* \* \* \* \*

A: I told him that I was going to need some help and my cousin would have to help me from San Antonio.

\* \* \* \* \* \*

Q: And did you tell him how your cousin was to help you?

A: No. 1, to be sure that the money was covered. That was his job, to be sure the money was there.

Q: Was your cousin, *as you stated to Gary Schwenk*, also to help with the killing of his wife?

\* \* \* \* \* \*

A: Yes sir. \* \* \* *He was to help kill his wife.*

Q: Now, I believe I heard on the tape, but let me ask you, please sir, did you tell the Defendant how you were going to do away with his wife?

A: Yes, sir. \* \* \* Overdose. O.D."[4]

Galindo testified that his "cousin" was in fact his partner in this undercover operation, Officer David Sheetz.

The record does not reveal how appellant's presence was obtained, but on July 28, 1976, he met David Sheetz for the first time in the parking lot of Northline Bank. According to Sheetz, the purpose of the meeting was as follows: "Mr. Schwenk had two thousand dollars that he was going to pay me—excuse me, put in a safety deposit box for killing his wife." At the parking lot, according to Sheetz,

"I approached [appellant]. \* \* \* I started off, walked up to the pickup and asked him, I said, 'Are you Gary,' at which time he replied, 'Yes, I am.' He asked if I was Darrell— \* \* \* and I stated I was."

---

1. V.T.C.A. Penal Code, § 15.03(a) denounces the offense of criminal solicitation as follows:
 "A person commits an offense if, with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission."

2. Another purpose of the meeting was to give Galindo an opportunity to show appellant photographs the former had taken of appellant's wife as she ostensibly went about her daily routine. These photographs were introduced into evidence as State's Exhibits numbered 1 through 6.

3. This meeting was tape recorded. Though this tape was played for the jury and admitted into evidence, it is not included in the record for this Court's consideration.

4. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

Sheetz testified that he and appellant discussed how the latter was to be contacted after "we had killed his wife" and the two then entered the bank in order to rent a safety deposit box. Inside the bank, Sheetz paid the $5.00 rental fee and a deposit box was taken out in both appellant's name and Sheetz's alias, "Darrell Scott;" only "Darrell Scott," however, signed the paper work. The two were then taken to their safety deposit box and shown how to open it. According to Sheetz,

"[Appellant] removed it from his pocket, counted out the two thousand dollars, placed it in the safety deposit box, locked the box. And [the bank employee] *gave Mr. Schwenk both keys* and we left the bank."

Upon leaving the bank, appellant was arrested.

On cross examination Sheetz testified that a recording made of his meeting with appellant "didn't come out very clear" and conceded there was nothing in his police report to indicate appellant had hired him, Sheetz, to kill his wife. So, on redirect examination, the prosecutor began,

"Q: When you first did see the Defendant ..., to go over this one more time, so that I am sure, did you have a conversation as to your participation in the actual murder of his wife?

A: Yes, sir, I did.

Q: And what did *you* tell *him* that *you were going to do?*

A: *We* told Mr. Schwenk that she would be killed by an overdose. I had the reputation of being a dope dealer and a killer out of San Antonio. And, to make it look as if it was accidental, *we* would fix her with an overdose."

In the trial court's instructions to the jury, appellant's conviction was authorized as follows in salient part:

"Now, if you should find... beyond a reasonable doubt that on or about the 28th of July, 1976, ... the defendant, *Gary Lee Schwenk*, did intentionally or knowingly, with intent that capital murder be committed, *request, command and attempt to induce D. B. Sheets* [sic]

to kill Carol Schwenk for remuneration and promise of remuneration, then you will find him guilty of criminal solicitation to commit capital murder as charged in the indictment."[5]

On appeal, appellant contends that at best, the evidence demonstrates his awareness of Galindo's engaging Sheetz to participate in the scheme to kill Carol Schwenk, but that nowhere in the record is there any evidence that he, appellant, actively solicited Sheetz's involvement as is alleged in the indictment; "mere acquiescence," appellant argues, is not the same as "commanding, requesting and attempting to induce" which was the conduct required under the charge of the court to justify his conviction.

The State's response is to recount the evidence as we have done *ante*, then conclude: "There is nothing in the record to suggest anything but that [appellant] *believed* Sheetz to be the 'doper' who he had requested and induced to kill his wife for $2,000.00." But this is not responsive to appellant's contention that the proscription against "criminal solicitation" contemplates active, initiative conduct on the part of one who is to be held criminally culpable thereunder.

The Practice Commentary to V.T.C.A. Penal Code, § 15.03, observes that § 15.03, supra, introduces a new offense to Texas law which "applies to a narrow area of conduct *very close to the beginning* of a criminal enterprise and may be thought of as an 'attempted' conspiracy." Indeed, it is because criminal solicitation *"reaches so far back into preparatory conduct,"* that it applies only to the most serious offenses, *viz:* capital and first degree felonies. The Practice Commentary sets out an instructive example, juxtaposing criminal solicitation with the other preparatory offenses denounced by Texas law:

"The nature and scope of Section 15.03 may be illustrated by a case in which A solicits B to kill C. If B agrees to do so, and either A or B acts in furtherance of the agreement, both A and B are guilty

---

**5.** The indictment filed against appellant alleged the offense in identical language.

of conspiracy. If B shoots at C but misses, both A and B are guilty of attempted murder. If, however, B refuses to undertake the homicidal project, the conduct of A [in soliciting B] was not criminal under prior law, but A is [now] guilty of criminal solicitation under Section 15.03."

See also *Doty v. State*, 585 S.W.2d 726 (Tex.Cr.App.1979) (Opinions Concurring and Dissenting).

The Commentary further asserts that "[t]he acts prohibited by subsection (a) [of § 15.03, supra] are *of an active, positive nature*, and the culpable mental state required is specific intent. Moreover, *the solicitation must be of specific conduct* thus excluding, for example, a political speech, however inflammatory."

While we intend no implication that the Practice Commentary constitutes legal authority by which this Court is bound, we review it here for whatever assistance it may offer relative to principles of statutory construction applicable to our penal code. See V.T.C.A. Penal Code, § 1.05(b); and Article 5429b–2, § 3.03(1)–(4), V.A.C.S.[6] Another resource in our quest for construction is a standard dictionary, from which we may glean "the rules of grammar and common usage" applicable to words or phrases which are in issue. See V.T.C.A. Penal Code, § 1.05(a) and (b); and Article 5429b–2, § 2.01, V.A.C.S.

"Request" is defined as "the act or an instance of asking[7] for something; to make a request to or of." Webster's New Collegiate Dictionary (1977); Webster's

Seventh New Collegiate Dictionary (1969). "Command" means "to direct authoritatively; order; to exercise a dominating influence over." *Id.* And "induce" means "to lead on; move by persuasion or influence; to call forth or bring about by influence or stimulation; effect, cause; ... to arouse by indirect stimulation."

We believe "the fair import of [the] terms"[8] which constitute the gravaman of the offense of criminal solicitation as proscribed by § 15.03(a), supra, compels the conclusion that the conduct denounced is indeed of an initiative "active, positive nature," and we so hold.[9] Having construed the statute, we turn now to measure the evidence adduced in this case against that statutory criterion.

We first observe that the evidence amply establishes appellant's criminal solicitation of Officer Galindo to commit capital murder. But for reasons known only to the State, such was not the allegation upon which appellant was tried and, thus, is not the issue before this Court. Neither was appellant tried for merely "attempting to induce" Officer Sheetz to commit capital murder.

We therefore likewise pretermit inquiry into the evidentiary sufficiency to establish that constituent of the State's burden of proof.

For it is clear that the conduct alleged and required to be found by the jury—that appellant *requested, commanded and attempted to induce* David Sheetz to kill Carol Schwenk for remuneration—was simply not established by the evidence adduced

---

**6.** The portions of the Practice Commentary selected and discussed *ante,* seem particularly appropriate to the following:

"Sec. 3.03. In construing a statute, whether or not the statute is ambiguous on its face, a court may consider among other matters the
 (1) object sought to be attained;
 (2) circumstances under which the statute was enacted;
 (3) legislative history;
 (4) common law or former statutory provisions, including laws upon the same or similar subjects; * * *"
Article 5429b–2, supra.

**7.** "Ask" is defined as "[the act of calling] on for an answer; to put a question about; speak, utter

[a question]." Synonyms listed for the applicable connotation are "ask;" "request;" "solicit;" the "shared meaning element" of these synonyms is *"to seek to obtain* by making one's wants known."

**8.** See § 1.05(a), supra.

**9.** As we have seen, conduct which is farther down the line of preparatory acts, is criminalized by V.T.C.A. Penal Code, §§ 15.02 (criminal conspiracy) and 15.01 (criminal attempt). As such this holding also best serves "to promote justice and effect the objectives of the code." Section 1.05(a), supra.

at trial. While the evidence appears to be sufficient to prove appellant passively agreed to the participation of and, thus, criminally conspired with Officer Sheetz,[10] under the facts shown here that was well after Sheetz's involvement had been "solicited" by Galindo, both in fact and in the mind of appellant. Accordingly, the evidence is insufficient to support the jury's verdict.

The judgment of conviction is reversed and reformed to show an acquittal.

TEAGUE, J., not participating.

Before the court en banc.

### OPINION ON STATE'S MOTION FOR REHEARING

McCORMICK, Judge.

On original submission a panel of this Court reversed appellant's conviction for criminal solicitation after finding that the evidence was insufficient to show that appellant actively solicited the involvement of Officer D.B. Sheetz in the plan to kill his wife. In its motion for rehearing, the State asks us to review this holding.

Appellant's indictment reads in pertinent part that he:

"did then and there unlawfully knowingly and intentionally with intent that a capital felony be committed, namely, capital murder, request, command, and attempt to induce D.B. Sheets (sic) to kill Carol Schwenk for remuneration and promise of remuneration."

V.T.C.A., Penal Code, Section 15.03, the statute describing the offense of criminal solicitation, reads:

"(a) A person commits an offense if, with intent that a capital felony or felony of the first degree be committed, *he requests, commands, or attempts to induce another to engage in specific conduct* that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission."

■ We have reviewed the entire record in this cause and find that we must reverse the holding of the panel opinion.[1] The record is more than adequate to support the jury's findings.

Testimony at trial showed that on or about July 5, 1976, Officers David Galindo and David Sheetz of the Houston Police Department were given information by an informant that appellant was interested in hiring someone to kill his wife. Through the informant Officer Galindo arranged a series of three telephone calls during which appellant would call Officer Galindo at prearranged public phone booths. During the the second call on July 16, appellant told Galindo he wanted his wife killed. When Galindo quoted a price of $8,000, appellant said he would have to think about it. Sometime after July 16, appellant called Galindo a third time. In this conversation Galindo told appellant that he would need some help in committing the murder and he would get his cousin, Darrell, a doper from San Antonio, to assist him. Unknown to appellant, Darrell was actually Galindo's

---

**10.** Section 15.02, supra, provides in relevant part:

"(a) A person commits criminal conspiracy if, with intent that a felony be committed:

(1) he *agrees* with one or more persons that they or one or more of them engage in conduct that would constitute the offense; *and*

(2) he or one or more of them performs *an overt act* in pursuance of the agreement.

(b) *An agreement constituting a conspiracy may be inferred from the acts of the parties.*"

**1.** The panel opinion made their holding without the benefit of a tape recording made between appellant and Officer Galindo, who was acting in an undercover capacity. This tape, although introduced into evidence and played to the jury, was not included in the appellate record. The writer of the panel opinion mistakenly noted that the *State* had failed to include the tape in the record. We recently held in *Durrough v. State* 693 S.W.2d 404 (Tex.Cr.App.1985), that exhibits are part of the appellate record which shall be included, whether designated or not. Therefore based on the authority given us at the time in Article 40.09(12) V.A.C.C.P., (now covered in Tex.R.App.Pro. Rule 55), we directed the trial court to forward the tape to us. The tape is now in our possession and we have reviewed it for the purpose of determining the merits of this case.

partner, Officer D.B. Sheetz. Appellant told Galindo that he would pay only $2,000 for the job. On July 26, Galindo and appellant had a face-to-face meeting behind a nightclub located on Airline Drive in Houston. This is the conversation that was recorded and presented to the jury during appellant's trial. During this conversation, the two men discussed the killing and the payment arrangements. Galindo also brought up the fact that his cousin Darrell would be helping him and that he would be splitting the money with Darrell. It was agreed that Darrell would meet appellant at a prearranged bank where the money would be transferred.

On July 28, appellant and Darrell (Officer Sheetz) met in the parking lot of the Northline Bank. At trial Sheetz testified as follows concerning their meeting:

"Q. And did you enter into any kind of a conversation with Gary Lee Schwenk that morning? .

"A. Yes, sir, I did.

"Q. And what did you all discuss, please, sir?

"A. How the money would be collected or turned over to me once his wife was dead.

. . . . .

"Q. Did you all have a conversation outside at that time?

"A. Yes, sir. Mr. Schwenk counted out two thousand dollars and placed it in his pocket. I asked him, you know, how to contact him after we had killed his wife. He gave me a phone number to call and we talked about going into the bank and putting the money in a safety deposit box in both our names, which we did."

The two men then went into the bank and took out a safety deposit box in both their names. Officer Sheetz paid the $5.00 rent on the box and then the following occurred:

"Q. Did you in fact open the safety deposit box at that time?

"A. Yes, sir, we did.

"Q. Okay. and what, if anything, did the Defendant Gary Schwenk do with the two thousand dollars at that time?

"A. He removed it from his pocket, counted out the two thousand dollars, placed it in the safety deposit box, locked the box. And she gave Mr. Schwenk both keys and we left the bank."

Immediately thereafter, appellant was arrested in the parking lot of the bank.

Viewing this evidence in the light most favorable to the verdict we are compelled to find that the evidence is sufficient to show that appellant "requested, commanded and attempted to induce" Sheetz when he met Sheetz at the Northline Bank.

On original submission appellant argued that the record was devoid of any testimony showing that appellant affirmatively requested Officer Sheetz to kill his wife for remuneration. The panel opinion relying on the Practice Commentary to Section 15.-03, supra, and standard dictionary definitions of the terms "request," "command" and "induce" held that the gravamen of the offense of criminal solicitation is conduct which is of an initiative, active and positive nature. Applying this holding to the facts of the case, the panel found that while the evidence showed appellant's passive agreement to Sheetz's participation, there was nothing to show that appellant solicited Sheetz's *initial* involvement in the scheme.

■ We agree that the solicitation must be of an active and positive nature. However, there is nothing in the statute which requires that the offense has to occur at the beginning of an actor's involvement in a criminal enterprise.

"Section 15.03 introduces a new offense to Texas penal law, punishing a person who solicits another to commit a capital or first degree felony. The conduct proscribed by Section 15.03 would not establish the actor's responsibility as a party to an offense, under Sections 7.01 and 7.02, because a completed offense is required for complicity responsibility; nor would the actor be amenable to punishment as a conspirator since the of-

fense of criminal conspiracy, Section 15.-02, requires an agreement and overt act. Although in some cases the solicitous conduct might constitute a criminal attempt under Section 15.01, the usual solicitation would not. Hence criminal solicitation applies to a narrow area of conduct very close to the beginning of a criminal enterprise and may be thought of as an "attempted" conspiracy.

"The nature and scope of Section 15.03 may be illustrated by a case in which A solicits B to kill C. If B agrees to do so, and either A or B acts in furtherance of the agreement, both A and B are guilty of conspiracy. If A shoots at C but misses, both A and B are guilty of attempted murder. If, however, B refuses to undertake the homicidal project, the conduct of A was not criminal under prior law, but A is guilty of criminal solicitation under Section 15.03." Searcy and Patterson, "Practice Commentary," V.T.C.A., Penal Code, Section 15.03.

Clearly the statute was designed to make conduct which does not rise to the level of attempt or conspiracy a criminal offense. Yet there is nothing in the statute which mandates the holding of the panel that this forbidden conduct *must* occur at the beginning of an actor's involvement.

 Clearly under the facts in the instant case, although Sheetz's initial involvement in the scheme came about through Galindo, appellant's transfer of money to Sheetz at the Northline Bank constituted the offense of criminal solicitation as to Sheetz. The fact that Sheetz had been initially introduced into the plan by Galindo is totally irrelevant. We find the evidence sufficient.

 We now go on to consider the other points of error raised by appellant on original submission. In two other points of error appellant argues that the trial court erred in denying his motion to quash. First he argues that there is no language in the indictment alleging the specific conduct that would have constituted the felony which appellant solicited Sheetz to commit. He contends the indictment should have alleged the amount of remuneration prom-

ised and the method by which Sheetz was to kill Carol Schwenk. He points to the indictment in *Hobbs v. State*, 548 S.W.2d 884 (Tex.Cr.App.1977) as exemplifying the correct means of charging the offense.

*Hobbs*, however, is not exactly on point. The indictment in *Hobbs* reads as follows:

"That Joyce Hobbs on or about the 25 day of July, A.D. 1975 ... did then and there attempt knowingly to cause the death of James Leon Hobbs by promising remuneration, to-wit: promising to pay Virgil McCuller $100.00 to kill the said James Leon Hobbs by shooting him with a gun."

Hobbs was convicted of attempted capital murder. On appeal, he argued that the indictment was fundamentally defective. This Court agreed because the indictment failed sufficiently to allege acts amounting to more than mere preparation that tended but failed to effect the commission of the offense intended. On rehearing, the State argued that while the indictment did not properly allege the offense of attempted capital murder, it did allege criminal solicitation and thus could not be fundamentally defective. This Court agreed with the State that although not a model form of pleading, the indictment was sufficient to allege the offense of criminal solicitation but since that offense had not been submitted to the jury to consider, fundamental error had still occurred. Hobbs' case was reversed and remanded. Although we approved the indictment in *Hobbs* as a correct means of alleging the offense of criminal solicitation, our opinion can in no way be construed as teaching that the indictment in a case such as the instant one must allege the amount of remuneration or the method by which a victim is to be killed.

The phraseology "knowingly and intentionally with intent that a capital felony be committed, namely, capital murder, request, command and attempt to induce D.B. Sheets (sic)" clearly alleges the elements of criminal solicitation. The remainder of the language "to kill Carol Schwenk for remuneration and promise of remuneration" clearly alleges specific conduct which constitutes a capital murder. V.T.C.A., Pe-

nal Code, Section 19.03(a)(3). The amount of remuneration promised or the method of killing are not necessary allegations for the offense of solicitation to commit capital murder. Therefore the trial judge was correct in overruling appellant's motion to quash.

Finally appellant argues that 'his motion to quash should have been granted because the use of the conjunctive "and" between the words "command" and "attempt" instead of the disjunctive "or" made it impossible to determine if the indictment was alleging criminal solicitation to commit capital murder or attempted capital murder.

 We disagree. Under Section 15.-03, supra, there are three ways of soliciting another: (1) requesting, (2) commanding, and (3) attempting to induce. It has long been held that when there are several ways or methods by which an offense may be committed set forth in the same statute, they may be alleged conjunctively. *Sidney v. State*, 560 S.W.2d 679 (Tex.Cr.App.1978). Furthermore, we note that several authorities recommend placing the conjunctive term in criminal solicitation indictments. Branch's Penal Code (3d ed.), Section 15.03, p. 646; McClung, Jury Charges for Texas Criminal Practice (1985) p. 320–321. Appellant's first and second points of error are overruled.

The State's motion for rehearing is granted and the judgment of the trial court is affirmed.

CLINTON, J., dissents, adhering to the opinion on original submission.

TEAGUE, J., not participating.