**AFFIRM; and Opinion Filed July 17, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-12-00748-CR**
_____

**JOHN  MARTIN FIALA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F10-49357-Q**

## MEMORANDUM OPINION

Before Justices Moseley, Bridges, and Lang-Miers
Opinion by Justice Bridges

Appellant John Martin Fiala appeals his conviction of criminal solicitation of capital murder and his accompanying sentence of sixty years' imprisonment and a $5,000 fine.  In four issues, appellant contends: (1) the evidence is legally insufficient to justify a finding of guilty of the offense of solicitation of capital murder; (2) the trial court erred by admitting irrelevant evidence in the punishment phase of trial; (3) the trial court committed reversible error by admitting evidence in the punishment phase of trial in violation of Texas rule of evidence 403; and (4) he was denied effective assistance of counsel at the punishment phase of trial.  We affirm.

**Background**

*1.      Guilt-Innocence Phase*

In 2008, J.R. met with Agent Leonard Whitton of the Texas Department of Public Safety, and accused appellant of sexually assaulting him in several Texas counties. By August of 2010, appellant, a former priest, had been indicted on at least four of these accusations.[1]  Appellant testified he had been removed from the priesthood due to the allegations of sexual assault against J.R.  In this case, appellant was convicted of criminal solicitation of the capital murder of J.R.

At trial, Scottie Ray Fisher testified he viewed an efficiency apartment in a house in Garland, Texas on November 2, 2010. Appellant, who was already living in the house, met Fisher to show him the apartment.  Fisher rented the unit for himself and moved in on November 3.  Fisher's unit was a converted garage, and appellant lived in an upstairs room. Fisher and appellant spent time together and "bonded."

When Fisher began inquiring into appellant's past, appellant revealed his pending indictments for sexual assault against J.R. and admitted he had two more indictments coming, but he could not afford to post bond. Fisher explained that appellant became upset and asked Fisher to kill J.R. because he had ruined his life, and that if J.R. was dead, all this would go away. Fisher indicated he expressed reservations to appellant. Appellant then asked if Fisher knew anyone who would kill J.R.  Fisher testified he did not want to be involved, so he pretended to have a brother who might be interested in killing J.R.

Fisher testified appellant told him that he would get a picture of J.R., either by contacting J.R.'s school or going online, so that Fisher's brother would know who to kill. The evidence

---

[1] Whitton testified Fiala had been indicted on three counts of sexual assault of a child under 17 and one count of aggravated sexual assault of a child under 17.

shows that, on November 17, 2010, appellant made eight internet searches regarding J.R. and also searched for J.R. on Facebook.

Fisher explained appellant needed to obtain some up-front money, but he was unable to secure a title loan on his car because he was unemployed. Fisher explained appellant devised a plan to transfer the title to Fisher, who would then take out the loan. To satisfy the title loan company, Fisher wrote out a bill of sale, stating that appellant had sold the car to Fisher for $1,500. On November 18, 2010, the loan company submitted the paperwork that transferred the registration to Fisher and gave Fisher a loan of nearly $700. Appellant directed Fisher to give his brother $500 or $600 out of the loan to buy a gun.

When Fisher pretended to call his brother on November 17, he had actually called J.R.'s attorney, using the pseudonym "Chris." After hearing Fisher's story, J.R.'s attorney told Fisher to call the police in Edwards County, which he did.

Edwards County Sheriff Letsinger called Officer Whitton in Del Rio on the morning of November 18 regarding Fisher's telephone call. Whitton called Fisher, who was still using the name "Chris." Fisher explained how appellant had thought he had called his brother to arrange a meeting, and that appellant had offered his car as a down payment on the killing. Because Whitton was eight hours away, he contacted DPS agents in Dallas, who arranged to meet with Fisher.

After he had cashed the title-loan check on November 18, 2010, Fisher met with three officers—Brant Doddy, Vince Ford, and Mark Negri—in Garland. During the meeting, Fisher explained that appellant wanted to hire his brother to kill J.R. Doddy was to pose as the brother. Fisher called appellant on speaker phone so the agents could hear appellant. When Fisher told appellant that he had given his brother the money for the gun and that his brother wanted to meet appellant that night, appellant replied, "Okay, sounds good."

–3–

The agents told Fisher that the meeting with appellant would be at a QuikTrip store in Garland. Around 6:00 or 7:00 p.m. that same day, the officers called Fisher and told him they were ready. Fisher told appellant his brother was waiting and drove him to the meeting.

Officer Doddy was waiting in a vehicle equipped with audio and video recording capabilities. Appellant got into the vehicle with Doddy, and appellant repeatedly asked Doddy to kill J.R., stating: (1) "I just want him gone, want him dead," (2) "I want him dead, absolutely dead," (3) "I don't care if you chop off his head, I don't care if you shoot him in the head," and (4) "I want him dead…whatever works best for you…your expertise."

Appellant told Doddy J.R. lived in Rocksprings with his grandmother. Appellant further promised to check on everything and make sure that J.R. would be home. Appellant confirmed he wanted the hit done for $5,000, and he wanted to make payments on that amount. He promised to have a picture of J.R. printed for Doddy. Appellant told Doddy that he had given Fisher his car to show how serious he was.

During the meeting, Doddy acted suspicious of appellant's motives, at which point appellant indicated his life was on the line, too, and acknowledged that, in making the agreement with Doddy, he would, at least, be an accomplice. Appellant said he would not even be talking to Doddy unless he knew it was safe. When Doddy got out of the car to go inside the gas station, a team of officers who had been monitoring the meeting arrested appellant.

At trial, appellant testified on his own behalf, stating he moved to Dallas in October 2010 from Rocksprings after being indicted for sexually assaulting J.R. Appellant testified that when he moved to Dallas, he had less than $200 in his bank account. He introduced his checking account statements from April 2010 to January 2011 into evidence. He stated that he did not have any other accounts. He pointed out that his account balance on November 18, 2010 was

$17.73 and that he was having financial difficulty the last few months. However, he did not have the records to show what was in his savings account.

Contrary to Fisher's testimony, appellant testified Fisher did not give him any money on November 18 and that having J.R. killed was Fisher's suggestion. Appellant testified Fisher had first suggested getting a loan on the car and had come up with the entire scheme of transferring the title and writing the bill of sale. He stated that Fisher found out about his criminal charges around November 16 when the Social Security Administration rejected his application to be a nurse for Fisher.

Appellant stated it was at this point that Fisher offered to kill J.R. Appellant testified that he thought this was strange, but that Fisher was serious. Appellant said that Fisher was prone to telling stories, so he played along even when Fisher called him on November 18 to say he was with his brother and they had the gun.

Appellant testified that when Fisher took him to meet Doddy on November 18, he did not want to go, but Fisher threatened him repeatedly and told him exactly what to say at the meeting. Appellant indicated everything he said to Doddy was what Fisher told him to say.

Appellant further stated that he was unaware Fisher had gotten the loan on the car, that Fisher first mentioned having $600 while driving to the meeting, and that he was confused when Doddy brought it up and said that he had the $600.

Appellant denied his intent that J.R. be killed. According to appellant, he wanted to keep Doddy calm, because Fisher had said that his brother was crazy. Appellant stated his intent was to seem to cooperate with Doddy without really giving him anything vital.

Appellant said Fisher had instructed him to bring Doddy a photo of J.R., but that he did not do so, even though he had photos of J.R. in his car. He insisted that he did not have any money to pay Doddy for the hit and he had no way to get any more money. Appellant stated he

intended to end the meeting and never see Doddy again. Appellant also admitted, however, that he wanted to make sure Doddy knew that he was going forward.

## 2.      *Punishment Phase*

After the jury convicted appellant of criminal solicitation of capital murder, the State called four witnesses at the punishment phase of trial. Because appellant claims there was error only as to two of the witnesses, we discuss only those two here.[2] Doddy testified that the day after he arrested appellant, he executed a search warrant on appellant's apartment. Agent Doddy discovered an assortment of toys and other children's objects in appellant's bedroom and closet. In addition to the toys, Doddy discovered appellant was in possession of priest attire, which included two handkerchiefs with an embroidered cross, a priest's collar, eucharist wafers, and the outer garment portion of a robe.

Detective David Walters testified that he conducted a forensic analysis of the laptop computer that was seized from appellant's apartment after his arrest. Walters searched the computer for pictures, files, and other data related to appellant and J.R. Walters prepared a report, which included the search history that had been introduced in the guilt-innocence phase, a rough draft of a blog entry that discussed pedophilia, pederasty, and homosexuality, and approximately 100 photographs of young men in various stages of undress that had been downloaded to the computer.

At the end of the punishment phase, the trial court assessed appellant's punishment at sixty years' imprisonment and a $5,000 fine.

---

[2] J.R. and his grandmother were the other two witnesses to testify at the punishment phase of trial.

**Analysis**

## 1.     *Sufficiency of the Evidence*

In his first issue, appellant contends the evidence was legally insufficient to support appellant's conviction of the offense of solicitation of capital murder, because the State failed "to prove specific intent that the offense of murder be committed." In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (plurality op.). We are required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326 ("a court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

In order to obtain a conviction, the State was required to prove beyond a reasonable doubt that appellant, with intent that a capital felony be committed, requested, commanded, or attempted conduct as the actor believed them to be, would constitute the felony or make the other a party to its commission. TEX. PENAL CODE ANN. §15.03(a). A person may not be convicted of criminal solicitation on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation. *Id.* at §15.03(b).

Here, appellant only contests the sufficiency of the evidence as to appellant's intent that the offense of murder be committed. A person acts with intent when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* at §6.03(a). Appellant cites this Court

to *Schwenk v. State*, 733 S.W.2d 142 (Tex. Crim. App. 1981) for the proposition that there must be a transfer of funds in order to show appellant's intent. We disagree with appellant's interpretation. Instead, the *Schwenk* court held criminal solicitation is an initiative of an "active, positive nature." *Id.* at 145. Furthermore, unlike in the *Schwenk* case, we have a clear recording of the meeting between appellant and Doddy. *See id.* at 144 (stating the officer testified a recording made of his meeting with appellant "didn't come out very clear.") We have reviewed the recording of the meeting between Doddy and appellant, in which appellant clearly asks Doddy to kill J.R. Over the course of the meeting, appellant asked Doddy to kill J.R. multiple times. Further, appellant told Doddy J.R. lived in Rocksprings with his grandmother. Appellant further promised to check on everything and make sure that J.R. would be home. Appellant confirmed that he wanted the hit done for $5,000, and that he wanted to make payments on that amount. He promised to have a picture of J.R. printed for Doddy. Appellant told Doddy that he had given Fisher his car to show how serious he was. During the meeting, Doddy acted suspicious of appellant's motives, at which point appellant indicated his life was on the line, too, and acknowledged that, in making the agreement with Doddy, he would, at least, be an accomplice.

In addition to the recorded evidence, Fisher explained at trial that appellant asked Fisher to kill J.R. because he had ruined his life, and that if J.R. was dead, all this would go away. Fisher indicated appellant asked if Fisher knew anyone who would kill J.R. Fisher further testified appellant told him that he would get a picture of J.R., either by contacting J.R.'s school or going online, so that Fisher's brother would know who to kill. On November 17, 2010, appellant made eight internet searches regarding J.R. and also searched for J.R. on Facebook.

In his brief, appellant contends "there could have been no specific intent on the part of Appellant that Doddy go forward with the murder of [J.R.] at the time he was arrested" because

–8–

"there was no transfer of funds and no expectation that funds would be transferred." However, the evidence shows Fisher met with officers prior to the meeting between Doddy and appellant. That meeting was also recorded. Our review of the recording demonstrates when Fisher called appellant on speakerphone in front of the officers, Fisher told appellant that he had given his brother the money for the gun and that he wanted to meet appellant that night. Appellant replied, "Okay, sounds good." Further, in the meeting between appellant and Doddy, appellant confirmed that he wanted the hit done for $5,000, and that he wanted to make payments on that amount.

At trial, appellant denied his intent that J.R. be killed. However, appellant admitted that he wanted to make sure Doddy knew that he was going forward. We are required to defer to the jury's credibility and weight determinations. *See Jackson*, 443 U.S. at 326. Reviewing the evidence in the light most favorable to the verdict and given the record before us, we conclude the evidence was sufficient to support appellant's intent to have J.R. killed. See *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894-95. We overrule appellant's first issue.

### 2.    *Admission of Evidence*

In appellant's second and third issues, he contends the trial court erred in admitting evidence through the testimony of Doddy and Walters during the punishment phase of trial. Appellant argues the evidence was irrelevant and violated Texas rule of evidence 403. Specifically, appellant complains of the following evidence in his brief: (1) pictures of toys found during the subsequent search of appellant's room; (2) pictures of priestly clothing and the eucharist wafers found in his room; and (3) approximately 100 photographs of young men in various stages of undress found on appellant's laptop computer.

*a. Standard of Review*

We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard. *Cameron v. State,* 241 S.W.3d 15, 19 (Tex. Crim. App 2007) (citing *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)). Because trial courts are in the best position to decide questions of admissibility, appellate courts uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement. *Cameron,* 241 S.W.3d at 19; *Montgomery,* 810 S.W.2d at 391. An appellate court may not reverse a trial court's decision regarding the admissibility of evidence solely because the appellate court disagrees with the decision. *Cameron,* 241 S.W.3d at 19; *Montgomery,* 810 S.W.2d at 391.

During the punishment phase of trial, "evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing." TEX. CODE CRIM. PROC. ANN. art. 37.07, §3(a)(1). The Legislature thereby allows a jury to consider a wide range of evidence in determining whether to recommend community supervision. *Ellison v. State*, 201 S.W.3d 714, 718 (Tex. Crim. App. 2006). Evidence is relevant to sentencing if it is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case. *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007).

*b. Appellant's Request for Community Supervision*

In the case before us, appellant applied for community supervision, and the jury received an instruction and verdict form that informed them of their authority to recommend community supervision. During the guilt-innocence phase of trial, he testified he was "looking at the possibility of probation all the way through." During the punishment phase, appellant's counsel requested either a short prison sentence or probation for appellant.

*c. Relevance Objection*

The portion of the record quoted in appellant's brief demonstrates he objected to relevance only with regard to the toys, priestly clothing, and eucharist wafers. Therefore, we only consider appellant's relevance argument as to objected-to evidence, namely the pictures of the toys, clothes and eucharist wafers. *See* TEX. R. APP. P. 33.1 (as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely objection).

The evidence before us shows appellant was a former priest, who had been relieved of his duties in October 2008 over accusations he sexually assaulted sixteen-year old J.R. When appellant objected to the admission of evidence of the priestly clothing and eucharist wafers, the State argued the evidence may be construed to show that even though he was relieved of his priestly duties in 2008, appellant "may be still using the authority of the church" as he did with J.R. With regard to the evidence of toys, the State argued the evidence demonstrated appellant's intent to commit sexual assault and proffered that appellant used gifts as part of the sexual assaults he committed against J.R.[3]

Given the record before us, we conclude the evidence of toys, priestly clothing, and eucharist wafers was within the wide range of evidence in determining whether to recommend community supervision. *See Ellison*, 201 S.W.3d at 718. Further, we conclude the trial court did not abuse its discretion in determining the evidence was relevant to sentencing. *See McGee*, 233 S.W.3d at 318; *Cameron,* 241 S.W.3d at 19; *Montgomery,* 810 S.W.2d at 391. We overrule appellant's second issue.

---

[3] Later, in the punishment phase of trial, J.R. testified that appellant gave him gifts, including money, cars, clothes, phones and a computer.

–11–

*d. Rule 403 Objection*

Appellant next contends the trial court erred by admitting evidence through the testimony of Doddy and Walters, because the risk of unfair prejudice substantially outweighed the evidence's probative value under Texas rule of evidence 403. On appeal, appellant specifically complains about the admission of evidence of the approximately 100 photographs, the toys, the priestly clothing, and the eucharist wafers. However, appellant failed to object on rule 403 grounds to the admission of the photographs of his priestly clothing and eucharist wafers, and we do not consider it now on appeal. *See* TEX. R. APP. P. 33.1.

In reviewing the trial court's determination of the probative and prejudicial value of evidence under Rule 403, we do not make a de novo determination, but reverse only upon a clear abuse of discretion. *Rachal v. State*, 917 S.W.2d 799, 808 (Tex. Crim. App. 1996). A rule 403 analysis should include, but is not limited to: (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Reese v. State*, 33 S.W.3d 238, 240-41 (Tex. Crim. App. 2000). A judge is presumed to engage in the required balancing test once Rule 403 is invoked. *See Williams v. State*, 958 S.W.2d 186, 195-96 (Tex. Crim. App. 1997) (citing *Santellan v. State,* 939 S.W.2d 155, 173 (Tex. Crim. App. 1997)). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Montgomery v. State,* 810 S.W.2d 372, 389 (Tex. Crim. App.1990).

At trial, appellant objected to the evidence of the toys as follows: "Our objection is that they're highly prejudicial and not probative to the case, not-not relevant to punishment." We have already determined the evidence regarding the toys was relevant to determining appellant's sentence. While appellant argues the State's argument that the possession of these toys indicated

–12–

appellant intended to commit sexual assault again was more prejudicial than probative, he concedes in his brief that the photographs of the toys, standing alone, were "innocuous." We, therefore, conclude the admission of the evidence regarding the toys was not an abuse of discretion. *See Rachal*, 917 S.W.2d at 808; *Montgomery,* 810 S.W.2d at 389.

With regard to the approximately 100 photographs taken from his computer, appellant objected at trial that "[i]t's highly prejudicial, and it's not probative." The photographs were admitted as part of State's Exhibit 31, a CD containing all of Walters's findings from appellant's laptop (findings from the Internet, which would include pictures, locations of data, things that have to do with J.R. and appellant). The State argues that the photographs were probative in the determination of appellant's punishment because, in the context of the other evidence, they demonstrate appellant's intent to commit sexual assaults in the future. Besides the complained-of pictures, the CD contained a rough draft of a blog entry, discussing pedophilia, pederasty, and homosexuality. The report on the CD also showed the same searches for J.R. that had been introduced during the guilt-innocence phase. Contrary to appellant's contention that the photographs "seem to resemble Abercrombie and Fitch ads more than anything else," the Court's review of the evidence shows the photographs were of young males in various states of undress, including photographs of erect and exposed penises. Considering all of the evidence, we conclude the trial court did not abuse its discretion in its conclusion that the approximately 100 photographs were more probative than prejudicial in determining appellant's punishment. *See Rachal*, 917 S.W.2d at 808. We overrule appellant's third issue.

### 3.    *Ineffective Assistance of Counsel*

In his fourth issue, appellant argues he was denied effective assistance of counsel at the punishment stage of trial because of his trial counsel's failure to object to the inflammatory and prejudicial argument of the State. Specifically, appellant complains of his trial counsel's silence

when the State argued "that mere possession of the items [toys, priestly clothing, wafers, and photographs] was proof that Appellant intended to commit sexual assault in the future." We first note appellant has failed to cite us to the record, showing us where this alleged argument of the State took place. It is not the task of an appellate court to pour through the record in an attempt to verify an appellant's claims. *See Segundo v. State*, 270 S.W.3d 79, 106 n. 1 (Tex. Crim. App. 2008) (op. on reh'g).

Still, we review a claim of ineffective assistance of counsel under the *Strickland* test. *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). In determining whether counsel rendered ineffective assistance, an appellate court considers two factors: (1) whether counsel's performance fell below an objective standard of reasonableness and (2) whether, but for counsel's deficient performance, the result of the proceeding would have been different. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex Crim. App. 1999). Appellant bears the burden of proving his counsel was ineffective by a preponderance of the evidence. *Id*. at 813.

There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 813. To defeat this presumption, appellant must prove that there was no plausible professional reason for a specific act or omission. *Bone*, 77 S.W.3d at 836. Any allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson*, 9 S.W.3d at 813. Thus, a reviewing court will rarely be able to fairly evaluate the merits of an ineffective assistance claim on direct appeal because the record on direct appeal is not developed adequately to reflect the reasons for defense counsel's actions at trial. *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007).

–14–

Here, we do not have an adequate record to review appellant's claim of ineffectiveness. *See id.*; *Thompson*, 9 S.W.3d at 813-15. Appellant must prove that there is no possible strategic reason for counsel's actions and trial counsel should be given the opportunity to explain his actions before being denounced as "ineffective." *Bone*, 77 S.W.3d at 836. The record before us is devoid of evidence from trial counsel himself and is "simply undeveloped and cannot adequately reflect the failings of trial counsel." *Thompson*, 9 S.W.3d at 814 (citing *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998)).

The record is silent as to why appellant's trial counsel failed to object to the alleged inflammatory and prejudicial argument of the State. Therefore, appellant has failed to rebut the presumption that counsel's decisions were reasonable, and we overrule appellant's fourth issue. *Bone*, 77 S.W.3d at 833; *Thompson*, 9 S.W.3d at 813-14.

## Conclusion

Having overruled appellant's issues, we affirm the judgment of the trial court.

/David L. Bridges/

DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120748F.U05

–15–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN MARTIN FIALA, Appellant

No. 05-12-00748-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F10-49357-Q.
Opinion delivered by Justice Bridges.
Justices Moseley and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 17th day of July, 2013.

/David L. Bridges/

DAVID L. BRIDGES
JUSTICE